SAWYER & LABAR LLP
ADRIAN SAWYER, State Bar No. 203712
  *sawyer@sawyerlabar.com*
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820

CAHILL GORDON & REINDEL LLP
JOEL KURTZBERG (admitted *pro hac vice*)
  *jkurtzberg@cahill.com*
JOHN MACGREGOR, State Bar No. 304330
  *jmacgregor@cahill.com*
IVAN TORRES (admitted *pro hac vice*)
  *itorres@cahill.com*
32 Old Slip
New York, NY 10005
Telephone: 212.701.3120

***Counsel for Defendant X Corp., X.AI Corp.,
and X.AI LLC***

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| ELIZA LABS, INC., a corporation, and SHAW WALTERS, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>X CORP., (fka Twitter), a corporation, X.AI CORP.,. a Nevada corporation, and X.AI LLC, a Nevada limited liability company<br><br>Defendants. | Case No. 3:25-cv-07243-AMO<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date: October 3, 2025<br>Time: 2:00 p.m.<br><br>**Judge:** Hon. Araceli Martínez-Olguín |

*(left margin, vertical text)* SAWYER & LABAR LLP · 1700 MONTGOMERY ST, STE 108 · SAN FRANCISCO, CA 94111 · TELEPHONE: 415.262.3820 · www.sawyerlabar.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ...................................................................1

**BACKGROUND** ......................................................................................2

   A.   Plaintiffs Violate X's Terms Of Service. ...........................................2

   B.   Plaintiffs Acknowledge Their Wrongdoing During X's Good-Faith Discussions Concerning Plaintiffs' Misconduct. ..................................................4

   C.   Plaintiffs Wait Nearly Four Months To File A TRO. .............................8

**ARGUMENT** ........................................................................................11

   I.   The Court Should Transfer Plaintiffs' Claims Rather Than Ruling On This Motion. .......12

   II.   Plaintiffs' Have Not Established Irreparable Harm. ............................14

   III.   Plaintiffs Have Not Demonstrated Their Claims Can Succeed on the Merits. ........17

      A.   Plaintiffs Are Not Likely To Succeed On Their Antitrust Claims. ...........17

      B.   Plaintiffs' Fraud Claims Are Unlikely To Succeed. ...........................19

      C.   Plaintiffs Are Unlikely To Succeed On Their State Law Claims. .............21

      D.   Plaintiffs' Claims Are Barred By Section 230 Immunity. .....................21

      E.   Plaintiffs' Claims Are Barred By the First Amendment. ......................23

   IV.   The Balance Of The Hardships Weights Against Plaintiffs. ..................24

**CONCLUSION** .....................................................................................25

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adtrader, Inc. Inc.* v. *Google LLC*,
    2018 WL 1876950 (N.D. Cal. Apr. 19, 2018) .......................................................... 16

*Alliance for the Wild Rockies* v. *Cottrell*,
    632 F.3d 1127 (9th Cir. 2011).................................................................................... 14

*Applied Elastomerics, Inc.* v. *Z-Man Fishing Prods.*,
    2006 WL 3251732 (N.D. Cal. Nov. 8, 2006)............................................................ 20

*Barnes* v. *Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009).................................................................................... 22

*Brantley* v. *NBC Universal Inc.*,
    675 F.3d 1192 (9th Cir. 2011)............................................................................... 18, 19

*Caccuri* v. *Sony Interactive Entertainment LLC*,
    2022 WL 2789554 (N.D. Cal. July 15, 2022) .......................................................... 17

*Card Tech International LLLP* v. *Provenzano*,
    2011 WL 13220317 (C.D. Cal. Apr. 6, 2011) .......................................................... 12

*Cargill, Inc.* v. *Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ................................................................................................... 19

*Cutting Edge Sols., LLC* v. *Sustainable Low Maint. Grass, LLC*,
    2014 WL 5361548 (N.D. Cal. Oct. 20, 2014) .......................................................... 17

*In re Da Vinci Surgical Robot Antitrust Litig.*,
    2024 WL 3641378 (N.D. Cal. July 30, 2024) (Martínez-Olguín, J.)...................... 17

*Daniels-Hall* v. *Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010)...................................................................................... 19

*Enigma Software Grp. USA, LLC* v. *Malwarebytes, Inc.*,
    946 F.3d 1040 (9th Cir. 2019).................................................................................... 22

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007).................................................................................... 14

*Fellowship of Christian Athletes* v. *San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023)....................................................................................... 25

*First Franklin Fin. Corp.* v. *Franklin First Fin., Ltd.*,
    356 F. Supp. 2d 1048 (N.D. Cal. 2005) .................................................................... 15

SAWYER & LABAR LLP
17700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

*Herb Reed Enter.* v. *Fla. Ent. Mgmt.*,
    736 F.3d 1239 (9th Cir. 2013) .................................................................... 14

*Huang* v. *Small Bus. Admin.*,
    2022 WL 3017521 (N.D. Cal. July 29, 2022) .......................................... 15

*Lydo Enter., Inc.* v. *City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) .................................................................... 14

*Mac Isaac* v. *Twitter, Inc.*,
    557 F. Supp. 3d 1251 (S.D. Fla. 2021) ..................................................... 23

*MicroDental Labs., Inc.* v. *Hoofard*,
    2021 WL 2179255 ............................................................................ 12, 14

*Miller* v. *Cal. Pac. Med. Ctr.*,
    991 F.2d 536 (9th Cir. 1993) ...................................................................... 14

*Moody* v. *NetChoice, LLC*,
    603 U.S. 707 (2024) .................................................................................... 23

*Munaf* v. *Geren*,
    553 U.S. 674 (2008) .................................................................................... 11

*Norbert* v. *City & Cnty. of S.F.*,
    10 F.4th 918 (9th Cir. 2021) ............................................................... 11, 12

*O'Handley* v. *Padilla*,
    579 F. Supp. 3d 1163 (N.D. Cal. 2022) ................................................... 23

*Oracle Am., Inc.* v. *CedarCrestone, Inc.*,
    938 F. Supp. 2d 895 (N.D. Cal. 2013) ..................................................... 18

*Osaic Wealth Inc.* v. *Ricci*,
    2025 WL 2391554 (N.D. Cal. Aug. 18, 2025) (Martínez-Olguín, J.) ...... 15

*Sanchez* v. *City of Fremont*,
    2024 WL 2031633 (N.D. Cal. May 6, 2024) (Martínez-Olguín, J.) ......... 11

*Stackla* v. *Facebook*,
    2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) .................................... 16, 24

*Stormans, Inc.* v. *Selecky*,
    486 F.3d 1109 (9th Cir. 2009) .................................................................... 24

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs.*,
    2014 WL 4312021 (N.D. Cal. Aug. 28, 2014) .......................................... 16

*Wright* v. *Nat. Bd. of Med. Exam'rs*,
    2021 WL 5028463 (D. Colo. Oct. 15, 2021) ............................................. 16

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

*X Corp.* v. *Bonta*,
116 F.4th 888 (2024) ................................................................................... 24

**Statutes**

47 U.S.C. §§ 230 (c)(1) and (c)(2) ............................................................... 21

47 U.S.C. § 230(c)(2) ....................................................................... 21, 22, 23

Cartwright Act .............................................................................................. 21

Cartwright Act or Cal. Bus & Prof. Code § 17200 ........................................ 21

Communications Decency Act of 1996 Section 230 ........................... 2, 21, 22

Federal Computer Fraud and Abuse Act ......................................................... 4

Texas Harmful Access to Computer Act ......................................................... 4

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

**PRELIMINARY STATEMENT**

Plaintiffs seek an injunction that would force X to reactivate plaintiffs' accounts and unblock links to their websites on X. That extraordinary request should be denied for the reasons below.

***Wrong Forum***. Plaintiffs assented to numerous agreements with mandatory forum-selection clauses that apply to this dispute and provide for exclusive venue in the Northern District of Texas, and for application of Texas law. This Court should therefore transfer the case to the agreed-upon forum and let any motion for a temporary restraining order ("TRO") be litigated there.

***No Irreparable Harm***. Plaintiffs have not suffered irreparable harm. Plaintiffs provide no persuasive explanation as to why, even if their claims were valid (and they are not), plaintiffs could not be made whole through money damages. Plaintiffs' lengthy delay in seeking injunctive relief alone forms an independent basis to find no irreparable harm. Plaintiffs waited 32 days after filing their original complaint and 110 days after their accounts were suspended to seek injunctive relief, and have provided no legitimate justification for that delay.

***No Likelihood of Success***. Plaintiffs are unlikely to succeed on the merits. While Plaintiffs claim that defendants concocted a nefarious scheme to monopolize the market for AI Agents on X by tricking and/or defrauding plaintiffs into providing nonpublic information about plaintiffs' AI Agents, copying certain features or functions of those AI Agents and incorporating them into defendants' own AI Agents, and removing plaintiffs from the market, the actual facts do not bear this implausible tale out. Indeed, the actual facts are much simpler: plaintiffs repeatedly and openly violated X's Terms of Service and Developer Agreement, publicly touting that their products depended on scraping X's data, circumventing X's API, and deploying tens of thousands of automated bots and/or spam accounts on X, all of which violated X's Terms of Service and Developer Agreement. In response, X suspended their accounts. In the ensuing discussions about plaintiffs' misconduct, plaintiffs admitted to their wrongdoing, but refused to provide information

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

sufficient to give X comfort that their violations had been remediated and would not recur.  Under the circumstances, X had every right not to reinstate plaintiffs' accounts, and all of plaintiffs' causes of action thus fail.  X's actions are also protected under Section 230 of the Communications Decency Act of 1996 and the First Amendment, both of which give X, not plaintiffs, the right to decide what content it does and does not permit on its platform.

***Balance of Equities and Public Interest***.  Plaintiffs suggest that the balance of equities and public interest favors reinstatement of their accounts.  But given plaintiffs' egregious violations of X's Terms and failure to satisfactorily assure X that their violations would not recur if their accounts were reinstated, the balance of equities decisively cuts against plaintiffs.  Moreover, it is never in the public interest to infringe on someone's constitutional rights, as plaintiffs' proposed relief would.

## BACKGROUND

### A.    Plaintiffs Violate X's Terms Of Service.

Plaintiff Eliza Labs, Inc. ("Eliza Labs") is an open-source software developer, founded by plaintiff Shaw Walters in 2024.  (AC ¶ 18-19.)  Plaintiffs build open-source software for operating autonomous "AI Agents" (that is, AI-driven computer programs that help humans "achieve specific goals") on social-media platforms—e.g, responding to comments on a social media post.  (*Id.* ¶ 33.) Until June 2025, some of plaintiffs' products operated on X's application program interface ("API"), a proprietary system that allows different software applications to communicate with each other. (*Id.* ¶ 35.)

According to plaintiffs' own public statements, plaintiffs' products depended on scraping X's data and circumventing X's API.  Specifically, plaintiffs publicly boasted that they maintained a "Twitter scraping library" that offered X data through a purported "Platform Integration" with "X (Twitter)" and "a twitter client for agents" with "no [X] API key necessary."  (Declaration of Christopher Park, dated October 1, 2025 ("Park Decl."), Ex. 1 at 1.)  Plaintiffs also publicly touted

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

their (1) "scraping and sending functionality for Twitter messages"; (2) "[f]ull-featured . . . X (Twitter) and Telegram connectors"; (3) "Twitter/X integration for the Eliza AI agent"; and (4) the ability to "automatically generate and post tweets based on your agent's character profile and topics." (*Id.*) Plaintiffs also publicly marketed their "[p]ost generation and management, [i]nteraction handling (mentions, replies), [s]earch functionality, Twitter Spaces support with [speech-to-text and text-to-speech] capabilities," "[m]edia handling (images, videos)," and "functionality to . . . retrieve users who retweeted a specific tweet" and "tweets that quote another tweet." (*Id.*)

Until June 2025, plaintiffs maintained developer accounts on the X platform. In creating, accessing, and using those accounts, plaintiffs affirmatively agreed to X's Terms of Service, which at all relevant times were prominently linked via blue hyperlinks on X's home page. Among other things, the Terms of Service provide the following:

- "[C]rawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited." (Declaration of Joel Kurtzberg, dated October 1, 2025 ("Kurtzberg Decl."), Ex. 2 at 7. )

- "You may not access the Services in any way other than through the currently available, published interfaces that we provide. For example, this means that you cannot scrape the Services without X's express written permission, try to work around any technical limitations we impose, or otherwise attempt to disrupt the operation of the Services." (*Id.* at 1.)

- "You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide." (*Id.* at 7.)

- "You may not do any of the following while accessing or using the Services: . . . access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us . . . unless you have been specifically allowed to do so in a separate agreement with us." (*Id.*)

The Terms also provide that X may "suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe . . . you have violated these Terms" or "for any other reason or no reason at our convenience." (*Id.*)

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

In addition, Eliza Labs separately agreed to X's Developer Agreement, which provides that a user "shall not" and "shall not attempt to (or allow others to)": (1) "use or access the Licensed Material to create or attempt to create a substitute or similar service or product to the X Applications"; or (2) "sell, rent, lease, sublicense, distribute, redistribute, syndicate, create derivative works of, assign or otherwise transfer or provide access to, in whole or in part, the Licensed Material to any third party except as expressly permitted in this Agreement." (Kurtzberg Decl., Ex. 3 at 6.)

Since plaintiffs' own public statements acknowledged their repeated and widespread violations of X's Terms of Service and Developer Agreement, on June 10, 2025—following a months-long investigation and dialogue with plaintiffs (Park Decl. ¶ 8)—X sent plaintiffs a cease-and-desist letter, explaining that plaintiffs' conduct violates the above provisions of the Terms of Service and Developer Agreement, as well as numerous federal and state laws, including the federal Computer Fraud and Abuse Act (which prohibits unauthorized access to, or exceeding authorized access to, X data) and the Texas Harmful Access to Computer Act (which prohibits accessing without authorization, or exceeding authorized access to, X's protected computer systems, including X data, API, and related systems or networks) (*Id.*, Ex. 1.) Based on these violations—which X reasonably viewed as "flagrant"—X "permanently deactivate[d]" plaintiffs' accounts and "revoked [their] access to X." (*Id.* at 1, 3.) X also demanded that plaintiffs "**immediately** cease and desist all unlawful activities concerning X Data and X API, and any further unlawful conduct" by June 13, 2025. (*Id.* at 1 (emphasis in original).)

**B.      Plaintiffs Acknowledge Their Wrongdoing During X's Good-Faith Discussions Concerning Plaintiffs' Misconduct.**

After plaintiffs received the cease-and-desist letter, they acknowledged their violations of X's Terms of Service and Developer Agreement by, among other things, agreeing to stop scraping data from X's platform and bypassing X's API. For example, on June 12, 2025, Shaw Walters

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

emailed X's Litigation team, noting that the plaintiffs had taken "immediate compliance actions," including by removing "functionality not directly using Twitter v2 API." (Park Decl., Ex. 3 at 1.) Walters also protested the suspension of his personal account because that account—ostensibly unlike Eliza's account—"has never been involved with any scraping." (*Id.*) In a separate message from June 21, 2025, Walters wrote to "confirm[] [that] all services ***improperly accessing*** X Data have been permanently removed from ElizaOS." (Park Decl., Ex. 5 at 11 (emphasis added).) The next day, a representative from Eliza (Sebastian Bulgarin) wrote that "[u]p until the APIs were removed, ElizaOS agents could also respond to [direct messages] and speak with voice on X spaces," but "we've removed all of that, since it's not available in the APIs offered by X." (*Id.* at 22.)

On June 30, 2025, X's Litigation team requested information to substantiate plaintiffs' claims that the breaches of X's Terms of Service and Developer Agreement had been fully remediated, "[g]iven the extent of the breach and the security concerns" raised by them. (*Id.*, Ex. 4, at 2.) In response, Walters wrote that he "cannot answer most of [X's] questions" because he viewed them as "wholly irrelevant to us." (*Id.* at 1.) Rather, Walters's position appears to be—as stated in a June 12, 2025 email to X's Litigation team—that because ElizaOS "is a free open source software project owned by its community and contributors," any violations of X's Terms of Service or Developer Agreement are attributable to third-parties using the ElizaOS platform, not to plaintiffs. (*Id.*, Ex. 3 at 1.) That position, however, ignores the fact that plaintiffs have at least some degree of control over the activities of ElizaOS, even if it is an "open source" site, as evidenced by the fact that, when confronted with X's cease-and-desist letter, plaintiffs promptly made numerous changes to the ElizaOS site by, for example, removing services they conceded were "improperly accessing X Data." Moreover, X has the right under the Terms of Service and Developer Agreement to deactivate accounts that promote or facilitate violations of its policies (Kurtzberg Decl., Exs. 2

(Terms of Service) at 7 and 3 (Developer Agreement) at 32, 36), and it is not disputed that plaintiffs promoted such open source activities on the ElizaOS site, since, among other things, Walters has publicly boasted that Eliza deployed approximately 50,000 bots on X (Park Decl. ¶ 36).  And X's concerns were well founded, since during its investigation, the company learned that Eliza's platforms had provided a framework for those bots to hack user functionality and circumvent X's API.  (*Id.* ¶ 15).

During X's discussions with plaintiffs, it became apparent that plaintiffs' activities far exceeded the scope of Eliza's developer license, and that should plaintiffs' accounts be reinstated, Eliza would need to purchase an enterprise API account—X's highest tier of access, available to businesses that access very large volumes of data—which is typical for companies that use or provide AI Agents and AI bots.  (*Id.* ¶ 11, Ex. 6.)  In response, Walters wrote that "we are a small, seed-stage startup focused on providing free, open source AI tools to the public," and that the enterprise API—which costs $50,000 a month—"would exceed our entire operational budget." (Park Decl., Ex. 3 at 2.)  Although plaintiffs claim that the enterprise API is a "scheme" to exclude competitors, plaintiffs acknowledge that some companies can afford to pay the monthly fee (AC ¶ 49), and some of those companies are developers of AI Agents, belying the notion that X is engaged in anticompetitive conduct (Park Decl. ¶ 11).

On July 15, 2025, plaintiffs' counsel sent the X Litigation team a demand to reinstate the suspended accounts, threatening legal action for "X's extortionate behavior and interference with our clients' business." (*Id.*, Ex. 5, at 2.)  That same day, X's Litigation team responded that plaintiffs had not "provided adequate support for [their] assertion that ElizaOS has 'demonstrat[ed] their full compliance with all [of] X's . . . terms and conditions.'" (*Id.*, Ex. 6, at 5.)  X further explained that "[c]ontrary to [plaintiffs' counsel's] baseless accusations, ElizaOS was not suspended for refusing to pay for X's Enterprise API, or any other API access," and was instead "suspended for repeatedly

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

violating X's Terms of Service, Developer Policy, and various other agreements, including by creating, maintaining, and touting a 'Twitter Scraping Library' designed to circumvent the X API and/or hack the X platform and allow bots and others to do the same." (*Id.*)  While X noted that plaintiffs' "continued failure to acknowledge, much less adequately remediate, these violations is the only reason their accounts have not been reinstated," X stated that it would be "willing to consider reinstating [the] accounts if it receives documentary support showing that *all* means of accessing X Data, through [plaintiffs'] GitHub libraries and elsewhere, have been permanently deprecated and cannot be reactivated," and "explain what steps have been taken, and will in the future be taken, to acknowledge and address these violations, including with respect to crawling, scraping, hacking, and other prohibited bot activity on the X platform." (*Id.* at 4 (emphasis in original).)

This back and forth was done in good faith by X for a single purpose—to ensure that the violations of X's Terms of Service and Developer Agreement had been adequately addressed and that, if plaintiffs' accounts were reactivated, there would be no similar violations in the future. (*Id.* ¶ 32.)  While plaintiffs alternated between conceding that the ElizaOS site permitted "improper" accessing of X Data that needed correcting (*id.*, Ex. 4, at 4), and denying any wrongdoing at all (*id.* at 1), they refused to provide X with the necessary assurances that the problems would not recur. And while plaintiffs accuse X of using the information obtained as part of this back and forth to launch "copycat products" or "AI Agents that mirror Eliza's offerings (*see, e.g.*, AC ¶ 67), that is simply untrue (*see* Park Decl. ¶¶ 32-34).  For starters, the information plaintiffs provided to X did not even relate to the features or functions of the AI Agents that plaintiffs claim were "copied." (*Id.* ¶ 33.)  Plaintiffs never provided X with "detailed know-how," nonpublic information about how their AI Agents function, or nonpublic information about the features they claim X "copied." (*Id.*) Nor did anyone at X ever share with anyone at X.AI any of the information plaintiffs provided to

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

X.  (*Id.* ¶ 34.)  In short, there was no "copying" of plaintiffs' products by anyone at X or X.AI.

What really happened is simple: plaintiffs violated X's Terms of Service and Developer Agreement, and their accounts were suspended for those violations.  (*Id.* ¶ 4.)  X did not reactivate those accounts because plaintiffs refused to demonstrate that their violations had been fully remediated and would not recur.  (*Id.* ¶ 32-34.)  X's Terms of Service expressly provide that X has the right to suspend accounts under such circumstances.  (*See* Kurtzberg Decl., Ex. 2 at 7.)

**C.    Plaintiffs Wait Nearly Four Months To File A TRO.**

After efforts to resolve the dispute failed due to plaintiffs' refusal to provide information demonstrating that their violations of X's Terms of Service and Developer Agreement had been remediated and would not recur, plaintiffs filed their original complaint on August 27, 2025.  In that complaint, plaintiffs alleged that X "deplatformed" them under "false pretenses" to "extract know-how, eliminate a competitor, and clear the field" for the launch of AI Agents operated by X.AI.  Although the complaint sought injunctive relief and plaintiffs claimed to have been irreparably harmed (Compl. ¶¶ 33-34), plaintiffs elected not to move for a TRO at that time.

On September 23, 2025, plaintiffs filed an amended complaint, making similar allegations, but adding basic details omitted from the original pleading, including the definition of the alleged markets underlying plaintiffs' purported antitrust claims.  Plaintiffs again chose not to move for a TRO—despite claiming in email correspondence with X's counsel on September 12 and 17, 2025, that plaintiffs were supposedly suffering "ongoing irreparable harm."  (Kurtzberg Decl. Ex. 1)

And although plaintiffs' counsel was repeatedly told—on September 9, 12, and 17, 2025—that plaintiffs had assented to numerous agreements containing mandatory forum selection clauses requiring litigation of this kind to be litigated in Texas courts under Texas law (*id* ¶ 19), plaintiffs nonetheless filed their amended complaint in this Court, purporting to assert claims under California law.

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

On their face, the claims in the amended complaint lack merit.  For example, plaintiffs assert claims for fraud, alleging that "Defendant X made knowingly false representations to Eliza Corp that it would reinstate and/or not deactivate Plaintiffs' accounts if Plaintiffs shared knowhow and implementation specifics about its AI Agents with X." (AC ¶ 249.)  But plaintiffs quote none of the communications giving rise to this claim—all of which were in writing, and all of which are in plaintiffs' possession—and never specify who at X supposedly made this representation, what form the representation took, or when it was allegedly made, as required by Federal Rule of Procedure 9(b).  And for good reason: at no point did X make that representation to plaintiffs.  (Park Decl. ¶ 30.)  The same is true of the allegation that "X promised Plaintiffs that if they demonstrated that they were in full compliance with X's terms and conditions . . . and provided additional details explaining Plaintiffs' full compliance, X would reactivate Plaintiffs' accounts."  (AC ¶ 263; Park Decl. ¶ 31.)  Rather, as plaintiffs well know, X told plaintiffs that "[g]iven the extent of [plaintiffs'] breach" of X's Terms of Service and Developer Agreement, and the "security concerns" posed by plaintiffs' conduct, X would require plaintiffs to provide documentation "demonstrating that the breaches have been remediated."  (Park Decl., Ex. 1 at 9.)  X told plaintiffs that once plaintiffs provided that information, X would "*evaluate* your use case for access to our official Enterprise API." (*Id*. at 14)  (emphasis added).)  X did not—as plaintiffs incorrectly claim—tell plaintiffs that their accounts "would [be] reinstat[ed] and/or not deactivate[d]" if plaintiffs "shared knowhow and implementation specifics about its AI agents with X."  (AC ¶ 249.)

Similarly, plaintiffs twist themselves into a pretzel to effectively limit the relevant markets to the X platform—a disfavored single-brand market dressed up as something broader.  Specifically, plaintiffs define three markets: the markets for (1) "Microblogging Social Media Platforms"; (2) "Social Media about AI"; and (3) "Generative AI Chatbots or AI Agents" (which plaintiffs later narrow to the market for "generative AI chatbots or AI Agents *operating on X*")  (AC ¶¶ 31; 170

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

(emphasis added).)  But since plaintiffs claim that they compete against Grok (*id.* ¶¶ 154-55)—which is available both on the X platform and elsewhere, including as a standalone product—it is not intuitive why the markets should be defined in such a narrow manner, rather than, for example, the market for AI Agents in social media feeds more generally.  The reason plaintiffs go to such extraordinary lengths to avoid alleging a straightforward and intuitive market is obvious: if the market were so defined, plaintiffs could not allege that the defendants hold monopoly power, given the vast array of social media platforms available to users.  Instead of confronting these obvious and dispositive shortcomings in their pleadings, plaintiffs instead seek to improperly limit their allegations to a disfavored single-brand market, even if doing so means alleging tortured market definitions that have no basis in reality.  Separately, plaintiffs lack antitrust standing because plaintiffs fail to provide proof of injury to competition, as opposed to injury only to themselves.

Finally, on September 28, 2025—32 days after filing their initial complaint, and 110 days after receiving X's cease-and-desist letter—plaintiffs filed their TRO request, before even serving X.AI with the amended complaint.  Plaintiffs suggest that their delay in requesting such relief was "due entirely to Plaintiffs' hope that filing of the lawsuit alone would lead to reinstatement once X realized Plaintiffs would not simply roll over." (TRO Br. at 2.)  But that suggestion makes no sense. Plaintiffs could have negotiated with defendants for reinstatement while simultaneously requesting injunctive relief from the Court.  But they chose not to.  And now, after choosing not to move for injunctive relief for nearly four months after their accounts were suspended, and more than a month after they filed their original complaint, plaintiffs claim that the need for a TRO is immediate and pressing, given an unspecified "product launch" supposedly scheduled for October 6, 2025.  (TRO Br. At 10. )  But plaintiffs provide no meaningful details about that purported "product launch," including, for example, when plaintiffs set the October 6 date, and whether this is, in fact, an "emergency" of plaintiffs' own making.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

In sum, plaintiffs repeatedly and openly violated X's Terms of Service and Developer Agreement.  In response, X suspended their accounts.  In the ensuing discussions about plaintiffs' misconduct, plaintiffs admitted to their wrongdoing, but refused to provide information sufficient to give X comfort that their violations had been remediated and would not recur.  Plaintiffs then sued X in this Court bringing claims under California law—even though plaintiffs were on notice that the Terms of Service require them to bring any claims against X in a Texas court under Texas law.  Then, 32 days after filing their complaint and 110 days after their accounts were suspended, plaintiffs moved this Court for a TRO, claiming they are suffering "irreparable harm" and that immediate relief is needed in light of a purported "product launch" plaintiffs refuse to describe in any meaningful detail.  As detailed below, these facts cannot form the basis of a valid temporary restraining order or preliminary injunction, and plaintiff's request should be denied.

## ARGUMENT

Plaintiffs seek "an extraordinary and drastic remedy," *Munaf* v. *Geren*, 553 U.S. 674, 689 (2008), and fall far short of carrying the heavy burden of establishing that such relief is appropriate. To obtain a TRO, plaintiffs must establish through evidence (rather than by merely alleging), that: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) a TRO "is in the public interest."  *Sanchez* v. *City of Fremont*, 2024 WL 2031633, at *5 (N.D. Cal. May 6, 2024) (Martínez-Olguín, J.).

A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Norbert* v. *City & Cnty. of S.F.*, 10 F.4th 918, 927 (9th Cir. 2021) (emphasis in original).  Because plaintiffs seek a mandatory injunction ordering X to take certain affirmative actions (by reactivating plaintiffs' accounts and unblocking their allegedly blocked

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

websites[1]), rather than merely preserving the status quo, the burden is "doubly demanding." *Garcia*

v. *Google*, Inc., 786 F.3d 733, 740 (9th Cir. 2015). Such relief "is particularly disfavored," and to

receive it, plaintiffs "must establish that the law and facts *clearly favor* [their] position, not simply

that [they] are likely to succeed." *Id.* (emphasis in original).

## I.    The Court Should Transfer Plaintiffs' Claims Rather Than Ruling On This Motion.

Plaintiffs' request for injunctive relief fails to clear the initial hurdle of establishing a

likelihood of success on the merits, since plaintiffs filed their claims in the wrong forum. *See*

*MicroDental Labs., Inc.* v. *Hoofard*, 2021 WL 2179255, at *4-5, n.4 (holding that plaintiff had not

shown a likelihood of success where plaintiff sued in the wrong court in contravention of a

mandatory forum-selection provision and requiring plaintiff to seek relief in the correct forum); *see*

*also Card Tech International LLLP* v. *Provenzano*, 2011 WL 13220317, at *1 (C.D. Cal. Apr. 6,

2011) (denying plaintiffs' TRO request where "it appears likely that this action should be dismissed

or transferred due to the forum selection clause" and "Plaintiff has not addressed the forum selection

clause—much less established that the clause is unenforceable"). As explained in more detail in

Defendants' Motion to Transfer, which is being filed contemporaneously with this brief, plaintiffs

filed this case in the wrong forum, as their claims are all governed by forum-selection provisions

requiring their claims to be brought exclusively in federal court in the Northern District of Texas or

state court in Tarrant County, Texas. (Declaration of Megan Scolari, dated October 1, 2025

("Scolari Decl."), at ¶ 32.).

Specifically, since November 15, 2024,[2] X's Terms of Service have contained the following

---

[1] Contrary to their claims, plaintiffs' website and GitHub link are not, in fact, blocked from being linked to or accessed by X users, and never have been. Instead, those sites have been marked as potentially "unsafe," but can be accessed by clicking through to the link in the "Ignore this warning and continue" line at the bottom of the warning.

[2] At all relevant times, the X User Terms provided that X Corp. may change the agreement's terms and conditions, and that continued access or use of the X platform constitutes acceptance of any changes. (*See* Scolari Decl., Ex.1 (Current X User Terms, effective November 15, 2025) at 9, Ex.

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

mandatory forum-selection provision, requiring all disputes to be brought exclusively in Texas:

> All disputes related to these Terms or the Services,[3] including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas, United States, and [users] consent to personal jurisdiction in those forums and waive any objection to inconvenient forum. (Scolari Decl., Ex. 1 at 9.)

And since October 11, 2024,[4] X's Developer Agreement contained the following mandatory forum-selection provision, requiring all disputes to be brought in Texas:

> All disputes related to this Agreement, including any disputes, claims, or controversies arising out of or relating to this Agreement, the marketing of Licensed Material, and/or [the user's] participation in the Licensed Material, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum. (*Id.* ¶ 31.)

As defendants explained to plaintiffs' counsel via email on September 9, 2025, X's User and Developer Terms of Service both include mandatory forum-selection provisions "requiring that disputes related to or arising from the use of X's Services be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas," and the agreements' choice-of-law provisions provide for application of Texas law. (Kurtzberg Decl., Ex. 1.) On three separate occasions before plaintiffs filed the amended complaint, defendants flagged

---

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

2 (X User Terms, as web-archived on August 26, 2025) at 4, Ex. 3 (Prior X User Terms, effective September 29, 2023 to November 14, 2024) at 10.)

[3] The "Services" are defined broadly as: "use of [X's] services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the 'Services'), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as 'Content')." (Scolari Decl., Ex. 1, at 2.)

[4] At all relevant times, X's Developer Agreement has also provided that X may change the agreement's terms and conditions, and that continued access or use of the Licensed Material, including by making recurring subscription payments, constitutes acceptance of any changes. (*See* Scolari Decl., Ex. 7 (Developer Agreement, last updated Oct. 11, 2024) at 9.)

the relevant forum-selection and choice-of-law provisions and asked plaintiffs' counsel whether they would consent to transferring the case to the Northern District of Texas.  (Id. ¶¶ 2, 8, 12, 16; Ex. 1.)  On each occasion, plaintiffs' counsel ignored defendants' request for a substantive explanation of their position.  (*Id.*)  Despite plainly being on notice of the binding forum-selection provisions governing their claims, plaintiffs nonetheless filed their amended complaint in this Court, and then filed their TRO in this Court the following week.

This Court should enforce the forum-selection provisions, transfer the case to the Northern District of Texas, and deny the TRO because the motion should be heard in the forum the parties agreed would decide this dispute.  *Hoofard*, 2021 WL 2179255, at *4-5.

## II.    Plaintiffs' Have Not Established Irreparable Harm.

To obtain a preliminary injunction, a plaintiff "must establish that irreparable harm is likely, not just possible." *Alliance for the Wild Rockies* v. *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "Speculative injury cannot be the basis for a finding of irreparable harm."  *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).  Rather, a party must "proffer evidence" of likely irreparable harm and may not rely on "unsupported and conclusory statements regarding harm [the plaintiff] might suffer."  *Herb Reed Enter.* v. *Fla. Ent. Mgmt.*, 736 F.3d 1239, 1250-51 (9th Cir. 2013).

***Plaintiffs Delayed Seeking an Injunction.***  A plaintiff's delay in seeking an injunction "implies a lack of urgency and irreparable harm."  *Miller* v. *Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993); *see also Lydo Enter., Inc.* v. *City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (because a "preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights," a plaintiff who "sleep[s] on its rights . . . demonstrates the lack of need for speedy action").  Here, as plaintiffs acknowledge, they delayed seeking injunctive relief for more than a month after they filed their initial complaint (TRO Br. at 2-3), and almost four

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

months after their accounts were suspended (*Id.* at 4). Courts have found that similar delays belie irreparable harm. *See, e.g.*, *Osaic Wealth Inc.* v. *Ricci*, 2025 WL 2391554 (N.D. Cal. Aug. 18, 2025) (Martínez-Olguín, J.) (finding an unexplained delay of over two months weighed against granting a TRO); *First Franklin Fin. Corp.* v. *Franklin First Fin., Ltd.*, 356 F. Supp. 2d 1048, 1055 (N.D. Cal. 2005) (finding that a three-month delay "undercuts . . . claims of urgency and irreparable harm"); *Huang* v. *Small Bus. Admin.*, 2022 WL 3017521, at *3 (N.D. Cal. July 29, 2022) ("Delays of one month or more are common grounds for denying motions for temporary restraining orders, and some courts deny emergency relief based on delays of as little as ten days.").

Plaintiffs' claim that their delay was "due entirely to Plaintiffs' hope that filing of the lawsuit alone would lead to reinstatement once X realized Plaintiffs would not simply roll over" falls flat. (TRO Br. at 2.) Were their harm truly irreparable, plaintiffs would have sought relief immediately upon suspension of their accounts, since they could have negotiated to have their accounts reinstated while simultaneously seeking injunctive relief. Any "hope that the filing of the lawsuit alone would lead to reinstatement" was unreasonable and is not a legitimate justification for the delay.

Plaintiffs could have moved for a TRO when their accounts were suspended (June 10), when the negotiations for reinstatement broke down (August 5, 2025), when they filed their original complaint (August 31), or when they filed their amended complaint (September 23), but chose not to do so. After failing to move for injunctive relief for nearly four months after the decision to suspend their accounts, and more than a month after filing their complaint, plaintiffs now claim that the need for a TRO is immediate and pressing, given an unspecified "product launch" purportedly scheduled for October 6, 2025. (TRO Br. at 10.) But plaintiffs provide no meaningful details about that supposed "product launch," including, for example, when plaintiffs set the October 6 date and how long they have known about it—information essential for the Court to determine if this is a genuine emergency or only an "emergency" of plaintiffs' own making.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Given these delays and the lack of a legitimate justification for them, any imminent risk of harm is a product of plaintiffs' own choices. That alone is a basis for denying the motion. *See Wright* v. *Nat. Bd. of Med. Exam'rs*, 2021 WL 5028463, *9 (D. Colo. Oct. 15, 2021) (denying preliminary injunction request in part because "the emergency nature of this litigation is at least in part due to" the applicants' own choices in delaying to seek injunctive relief).

**Money Damages Are Adequate to Address the Alleged Harm.** None of plaintiffs' asserted injuries are irreparable because they can be remedied by money damages. *Wells Fargo & Co.* v. *ABD Ins. & Fin. Servs.*, 2014 WL 4312021, at *10 (N.D. Cal. Aug. 28, 2014). The crux of the harm plaintiffs complain of is the risk of needing "to pivot their business model" following the suspension of their accounts, which allegedly "disrupted their operations" and threatens to halt "adoption at the critical launch window of a new product" (TRO Br. at 11). However, since plaintiffs themselves have explained that their product offers "200+ plugins, with connectors to Discord, Telegram, Faraster, Bluesky, Lens, Slack, Teams, etc.," (Park Decl. Ex. 5 at 25), plaintiffs' suggestion that X's actions risk "spiraling Eliza into irrelevance" amounts to the sort of speculative claims of irreparable harm courts routinely reject. *See, e.g.*, *Stackla* v. *Facebook,* 2019 WL 4738288, at *5 (N.D. Cal. Sept. 27, 2019). In sum, plaintiffs allege that defendants caused harm to their business by making it harder for them to promote their new products (TRO Br. at 8-9), which is precisely the type of harm that can be remedied through an award of damages.

**Any Harm to Plaintiffs Is Self-Inflicted.** Courts routinely decline to find irreparable injury where the claimed harm is self-inflicted. *See, e.g.*, *Adtrader, Inc. Inc.* v. *Google LLC*, 2018 WL 1876950, *4 (N.D. Cal. Apr. 19, 2018) ("Harm does not constitute irreparable injury if it is self-inflicted."). Plaintiffs agreed to comply with X's Terms of Service and Developer Agreement (Scolari Decl., ¶ 32), and were plainly on notice that X's Terms of Service provide that X may "suspend or terminate your account or cease providing you with all or part of the Services at any

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

time if we reasonably believe . . . you have violated these Terms" or "for any other reason or no reason at our convenience."  (Scolari Decl., Ex. 5)  Despite their agreement to comply with X's Terms of Service, plaintiffs violated multiple provisions within those terms, and even publicly boasted about engaging in activity that violated the Terms.  (Park Decl. ¶ 35.)   Having failed to comply with X's Terms, plaintiffs cannot now point to the harm that followed from X's decision to terminate their access for non-compliance as a basis to establish irreparable harm.

## III.    Plaintiffs Have Not Demonstrated Their Claims Can Succeed on the Merits.

Plaintiffs' motion should also be denied because plaintiffs have not submitted "proof sufficient to show [they have] a strong chance of success on the merits."  *Cutting Edge Sols., LLC* v. *Sustainable Low Maint. Grass, LLC*, 2014 WL 5361548, at *8 (N.D. Cal. Oct. 20, 2014).

### A.    Plaintiffs Are Not Likely To Succeed On Their Antitrust Claims.

First, plaintiffs are not likely to succeed on their antitrust claims.  Plaintiffs allege three markets: (1) "Microblogging Social Media Platforms"; (2) "Social Media about AI"; and (3) "Generative AI Chatbots or AI Agents" (which plaintiffs later narrow to the market for "generative AI chatbots or AI Agents *operating on X*") (AC ¶¶ 31, 170 (emphasis added).)  But these unusual and counterintuitive market definitions are nothing more than a thinly veiled attempt to define an impermissible single-brand market.  *See Caccuri* v. *Sony Interactive Entertainment LLC*, 2022 WL 2789554, at *3 (N.D. Cal. July 15, 2022) ("It is an understatement to say that single-brand markets are disfavored."); *In re Da Vinci Surgical Robot Antitrust Litig.*, 2024 WL 3641378, at *2 (N.D. Cal. July 30, 2024) (Martínez-Olguín, J.) ( "[s]ince *Kodak*, the Supreme Court and Ninth Circuit have only found single-brand markets plausible in the context of aftermarkets which are 'wholly derivative from and dependent on the primary market,'" which plaintiffs do not allege here).

Plaintiffs' antitrust claims fall apart without these contrived and impermissible market definitions.  Plaintiffs concede that they are direct competitors of Grok, an AI Agent that is available

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

both on the X platform and elsewhere, including as a standalone product.  Since plaintiffs' direct competition is available outside of the markets for "Microblogging Social Media Platforms," "Social Media about AI," or "generative AI chatbots or AI Agents operating on X," it makes no sense for the markets in this case to be defined so narrowly, rather than, for example, the market for AI Agents in social media feeds more generally.  This is especially true because Eliza alleges that its customers use its "open source product offerings" to "build AI Agents."  (AC ¶ 35.)  At no point do plaintiffs allege or offer proof that these customers are in any way "locked in" to using X or X.AI such that the customers are interested solely in "build[ing] AI Agents" on those platforms, rather than on social media platforms more broadly.  *See, e.g.*, *Oracle Am., Inc.* v. *CedarCrestone, Inc.*, 938 F. Supp. 2d 895, 908 (N.D. Cal. 2013) (dismissing antitrust claims because plaintiffs failed to allege that customers were "locked in due to high switching and information costs").  And any such allegations would be belied by plaintiffs' own website, which contains code for customers to link Eliza's software to numerous other social-media platforms, including YouTube, Telegram, Discord, WhatsApp, and WeChat.[5]   When the market is properly defined, it is readily apparent that X and X.AI lack monopoly power, given the vast array of social media platforms with which they compete. Plaintiffs' antitrust claims thus fail as a matter of law.

The antitrust claims also fail because plaintiffs fail to provide proof of any injury to competition, as opposed to injury only to themselves, and thus lack antitrust standing.  *See, e.g., Brantley* v. *NBC Universal Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2011) ("Plaintiffs may not substitute allegations of injury to the claimants for allegations of injury to competition.").  To satisfy this requirement, plaintiffs must provide proof of facts that "would allow them to recover for an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Id.* (internal quotation marks omitted).  Plaintiffs fail to do that here.

[5] ElizaOS Plugin Registry, https://github.com/elizaos-plugins/registry/blob/main/index.json.

-18-                     Case No. 3:25-cv-07243-AMO

1    For example, plaintiffs argue that X's request that plaintiffs pay for an Enterprise API is

2    prohibitively expensive and anticompetitive.  (AC ¶ 49.)  But plaintiffs also concede that some

3    companies can afford to pay the monthly fee for such a license (*id.*; *see also* Park Decl., Ex. 3 at 2),

4    and in fact, the evidence in this case is that there are developers of AI Agents that ***do*** pay for the

5    Enterprise API  (Park Decl. ¶¶ 10-11.).  Put differently, plaintiffs ignore that there ***are*** competitors

6    in the market for AI Agents on X and that the Enterprise API does not prevent them from competing

7    in that market.  Accordingly, plaintiffs fail to show an injury to competition—as opposed to a mere

8    injury to themselves—which provides an additional basis for holding that the antitrust claims are

9    unlikely to succeed.  *See Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U.S. 104, 109-10 (1986).

10    **B.    Plaintiffs' Fraud Claims Are Unlikely To Succeed.**

11    Plaintiffs' intentional misrepresentation claims are based on allegations that "X knowingly

12    made false representations that it would reinstate Plaintiffs' accounts if Plaintiffs provided detailed

13    knowhow and implementation specifics about their AI Agents."  (TRO Br. at 12.)  But those

14    allegations are belied by the actual correspondence between X and plaintiffs, which demonstrates

15    that X said it would merely "***evaluate*** [plaintiffs'] use case for access to our official Enterprise API"

16    if plaintiffs provided information sufficient for X to ensure that plaintiffs' misconduct had been fully

17    remediated and would not recur—not that X would, in fact, reinstate plaintiffs' accounts.  (AC ¶ 58;

18    Park Decl., Ex. 3).  Plaintiffs do not, and cannot, offer factual evidence supporting their claims, and

19    X's declarant, Christopher Park—who is familiar with the back-and-forth on this issue—denies that

20    any such representations were made to plaintiffs by anyone at X.  (Park Decl. ¶¶ 18, 22-25, 30-32.)

21    Nor is plaintiffs' reliance on conclusory allegations that X's statements were misleading (AC ¶¶ 13,

22    57, 72, 249-51, 263) sufficient to meet the high bar for the extraordinary relief sought here, *see*

23    *Daniels-Hall* v. *Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (explaining that courts are not

24    required "to accept as true allegations that contradict exhibits attached to the Complaint or matters

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

1  properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions

2  of fact, or unreasonable inferences.").

3      Plaintiffs' misrepresentation claims are also based on allegations that "X knowingly made

4  false representations that it would reinstate Plaintiffs' accounts if Plaintiffs provided detailed

5  knowhow and implementation specifics about their AI Agents."  (TRO Br. at 12.)  Although

6  plaintiffs claim the complaint is "replete with specific factual allegations and evidence supporting

7  this" claim (*id.*), that is not true—plaintiffs do not allege who made those representations, when they

8  were made, how they were made, or provide any other details required by Rule 9(b).

9      Plaintiffs' concealment and false promise claims fail for similar reasons.[6]  As for the

10  concealment claim, plaintiffs argue that "the Complaint alleges that X concealed its true intent:

11  regardless of Plaintiffs' compliance or information sharing, X would not reinstate Plaintiffs'

12  accounts and was actively developing a competing product."  (*Id.* at 13.)  And as to the false promise

13  claim, plaintiffs supposedly "allege that X made false promises that it would reactivate plaintiffs'

14  accounts upon demonstration of compliance with X's terms and conditions."  (*Id.*)  But as with the

15  intentional misrepresentation claims, these claims depend entirely on plaintiffs' mischaracterization

16  of X's correspondence, which does not state that X would reinstate plaintiffs' accounts.

17      In any event, even if the alleged "promises" or "representations" were made, plaintiffs'

18  reliance on them would be inherently unreasonable and unjustified, since X's Terms plainly provide

19  that X may suspend accounts for any reason or no reason.  *Applied Elastomerics, Inc.* v. *Z-Man*

20  *Fishing Prods.*, 2006 WL 3251732, at *6 (N.D. Cal. Nov. 8, 2006) ("Reliance on representations

21  that contradict clear and unambiguous terms of an agreement is unjustified as a matter of law.").[7]

22

23  [6] Plaintiffs do not even attempt to argue that they are likely to prevail on their unjust enrichment claims.  Regardless, as these claims plainly sound in fraud (AC ¶ 285), and are based on the same

24  allegations as plaintiffs' fraud claims, plaintiffs' unjust enrichment claims are likely to fail for similar reasons.
[7] Plaintiffs purport to bring their fraud claims under California law, even though the relevant Terms

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

**C.    Plaintiffs Are Unlikely To Succeed On Their State Law Claims.**

Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their Cartwright Act or Cal. Bus & Prof. Code § 17200 claims, since plaintiffs cannot overcome the Texas choice-of-law provisions in the relevant agreements.[8]  (*See* Scolari Decl., Ex. 1 (X Terms of Service) ("The laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us, notwithstanding any other agreement between you and us to the contrary.");  Scolari Decl. Ex. 5 (X Developer Agreement) ("The laws of the State of Texas, excluding its choice of law provisions, will govern this Agreement and any dispute that arises between you and X, notwithstanding any other agreement between the parties to the contrary.");  Pohlen Decl., Ex. 1 (xAI Terms of Service) ("This agreement and all claims or disputes between You and xAI shall be governed by the laws of Texas without regard to conflict of law principles[.]").)   As such, and given that it is beyond dispute that Texas has a "substantial relationship" as to at least X, whose principal place of business is in Texas (Scolari Decl., Ex. 1 § 6), plaintiffs cannot show that they are likely to prevail on their Cartwright Act or § 17200 claims.

Plaintiffs' § 17200 claims also fail because portions of those claims sound in fraud (AC ¶¶ 276-77), and are based on the same deficient allegations addressed in Part III.B above.  Similarly, plaintiffs' Cartwright Act claims and the portions of their § 17200 claims based on alleged antitrust violations (AC ¶¶ 273-75, 279) are unlikely to succeed for the reasons addressed in Part III.A above.

**D.    Plaintiffs' Claims Are Barred By Section 230 Immunity.**

Plaintiffs are unlikely to succeed on the merits of any of their claims for the additional reason that their claims are barred under 47 U.S.C. §§ 230 (c)(1) and (c)(2), since they seek to impose

---

of Service and agreements, as noted above, require application of Texas law.  (AC ¶ 272.)  That alone is an additional basis for holding that the claims are unlikely to succeed.

[8] As none of the injunctive relief sought by plaintiffs is directed as either of the xAI Defendants, the Court need not consider at this time whether plaintiffs are prohibited from bringing claims under California law against the xAI Defendants.

liability on X for its decision not to publish plaintiffs' content.  Section 230(c)(2) provides that "[n]o provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."  47 U.S.C. § 230(c)(2).  X's decision to restrict plaintiffs' access to X's platform based on the violations of X's Terms of Service—and X's good-faith belief that plaintiffs would continue to contribute to activity on its platform that was "harassing" or "otherwise objectionable" (Park Decl. ¶¶ 4-5, 8, 15)—fits squarely within the scope of this immunity.  Plaintiffs attempt to sidestep this immunity by arguing that defendants' actions amount to "anticompetitive acts," which are not protected under Section 230. (TRO Br. at 23.)  But plaintiffs have not offered evidence of anticompetitive acts sufficient to carry their burden on a motion for preliminary injunctive relief, since plaintiffs rely only on their own conclusory and self-serving allegations.

Moreover, while the Ninth Circuit has recognized an exception to immunity under Section 230(c)(2) for "blocking and filtering decisions that are driven by anticompetitive animus," *see Enigma Software Grp. USA, LLC* v. *Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019), that exception does not extend to the protections provided under Section 230(c)(1).  The Ninth Circuit's decision in *Enigma* was based on the court's conclusion that the "statutory language, history, and case law" indicates that "providers do not have unfettered discretion to declare online content 'objectionable,'" because the statutory language of Section 230(c)(2) immunizes only decisions to block content because it "was objectionable within the meaning of § 230," not decisions motived by some alternate reason, such as an anticompetitive animus.  *Id.* at 1050.  However, the same ambiguous limiting language relied on by the court in *Enigma* is not present in Section 230(c)(1), which instead "creates a baseline rule: no liability for publishing or speaking the content of other

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

information service providers." *Barnes* v. *Yahoo!, Inc*., 570 F.3d 1096, 1108 (9th Cir. 2009).  Thus, even if plaintiffs' claims are not precluded by Section 230(c)(2), they still fail under Section 230(c)(1), because X is an "interactive computer service," in that it "provides or enables computer access by multiple users to a computer serv[er]," and plaintiffs' accounts and other users' posts that reference plaintiffs' websites constitute "information created by another information content provider," since X was not involved in their creation, and such materials are forms of information.

### E.  Plaintiffs' Claims Are Barred By the First Amendment.

As the Supreme Court has explained in no uncertain terms, online platforms' content-presentation decisions are "protected speech." *Moody* v. *NetChoice, LLC*, 603 U.S. 707, 744 (2024). Consistent with that decision, courts have recognized that "[l]ike a newspaper or a news network, [X] makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment." *O'Handley* v. *Padilla*, 579 F. Supp. 3d 1163, 1186-88 (N.D. Cal. 2022) (dismissing on First Amendment grounds claims based in part on X's permanent suspension of a user's account); *see also id.* at 1188 ("[X] has important First Amendment rights that would be jeopardized by a Court order telling [X] what content-moderation policies to adopt and how to enforce those policies."); *Mac Isaac* v. *Twitter, Inc.*, 557 F. Supp. 3d 1251, 1261 (S.D. Fla. 2021) (noting that X "has a First Amendment right to decide what to publish and what not to publish on its platform" (internal quotation marks omitted)).

As explained above, plaintiffs' claims against X seek to hold X liable for its editorial decisions about what content is disseminated on X, as plaintiffs' claims all seek to hold X liable for its decision to suspend plaintiffs' accounts and to allegedly block posts referencing plaintiffs' websites.  All of plaintiffs' claims seek to force X to carry content on its platform that plaintiffs want them to carry, but that X does not want to carry.  Accordingly, the First Amendment bars those

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

1  claims, making it unlikely that plaintiffs will prevail on them.

2  **IV.    The Balance Of The Hardships Weights Against Plaintiffs.**

3          A party seeking injunctive relief must also establish that "the balance of equities tips in

4  [their] favor." *Stormans, Inc.* v. *Selecky*, 486 F.3d 1109, 1138 (9th Cir. 2009).  Plaintiffs claim that

5  the balance of the equities tips in their favor because their claimed irreparable harm outweighs any

6  harm that would result to defendants from reinstating their accounts, and because the public interest

7  is not served by their exclusion from the X platform.  The opposite is true.

8          First, as plaintiffs' removal from the platform resulted from their own breaches of X's Terms

9  of Service, plaintiffs' alleged harm does not qualify as irreparable.  *See Supra* at II; *see also* 11A

10  Wright, Miller & Kane, Federal Practice & Procedure, § 2947 (2d Ed.1995) ("If the harm

11  complained of is self-inflicted, it does not qualify as irreparable.").  Moreover, plaintiffs' contention

12  that the potential harm to defendants would be negligible downplays the very sort of harm to both

13  defendants and valid public interests that other courts have found to tip the balance of the equities

14  against similar requests for injunctive relief.  *See Stackla*, 2019 WL 4738288, at *6 (denying TRO,

15  in part, because a TRO "would compel Facebook to permit a suspected abuser of its platform and

16  its users' privacy to continue to access its platform and users' data for weeks longer, until a

17  preliminary injunction motion could be resolved" and because "Facebook's ability to decisively

18  police the integrity of its platforms is without question a pressing public interest").   These

19  considerations are especially pressing here, where defendants have a good-faith basis to believe that

20  plaintiffs' continued access to the X platform will threaten core X rules that seek to protect X users

21  from "misleading and deceptive identities" and "synthetic and manipulated media," including

22  because defendants have reason to suspect that plaintiffs' products pose the risk of introducing "tens

23  of thousands of bots" onto the X platform.  (Park Decl. ¶ 15.)

24          In addition, as the Ninth Circuit has repeatedly noted, "it is always in the public interest to

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

prevent the violation of a party's constitutional rights." *X Corp.* v. *Bonta*, 116 F.4th 888, 904 (2024); *Fellowship of Christian Athletes* v. *San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023). Since compelling X to carry plaintiffs' messaging against its will would violate the First Amendment, the balancing of equities here counsels in favor of denying plaintiffs' TRO request.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny plaintiffs' motion.

DATED:  October 1, 2025                    Respectfully submitted,

                                           CAHILL GORDON & REINDEL LLP


                                   By   /s/ Joel Kurtzberg
                                        _____
                                        Joel Kurtzberg (admitted *pro hac vice*)

                                        ***Attorney for Defendants X Corp., X.AI Corp.,***
                                        ***and X.AI LLC***